## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CHRISTINA LACHAPELLE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEARST COMMUNICATIONS, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christina Lachapelle ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

### INTRODUCTION

1.       Defendant Hearst Communications, Inc. ("Hearst") licensed, rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Christina Lachapelle's *Woman's Day* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed her information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Ms. Lachapelle has received a barrage of unwanted junk mail.  By licensing, renting, exchanging, and/or otherwise disclosing Ms. Lachapelle's Personal Reading Information (defined below), Hearst violated Rhode Island's Video, Audio and Publication Rentals Privacy Act, General Laws § 11-18-32 (the "RIVRPA").

2.       Documented evidence confirms these facts.  For example, a list broker,

American List Counsel, Inc., ("ALC") offers to provide renters access to the Personal Reading Information of 8,804,819 subscribers from the "Hearst Masterfile" list at a base price of "$110/M [per thousand]," (i.e., 11 cents apiece).

## Hearst Masterfile

Hearst Magazines is one of the world's largest publishers of monthly consumer magazines. Its category leading titles have been merged to present an unduplicated masterfile of consumers living well.

http://www.hearst.com/magazines

| SEGMENTS | PRICE |
|---|---|
| 8,804,819 TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 3,225,858 6 Month Active Subs | + $12.00/M |
| 2,045,540 3 Month Active Subs | + $14.00/M |
| 791,204 1 Month Active Subs | + $17.00/M |
| 6,770,392 6 Month Opted-In Email * | $150.00/M |
| 2,399,201 12 Month Expires | $80.00/M |
| 2,516,789 Change Of Address | + $13.00/M |
| 342,020 Business Address | + $11.00/M |
| 204,783 Gift Givers | + $14.00/M |
| 406,042 Sweeps Yes (Case by Case) | + $12.00/M |
| 2,269,858 Active Republicans | + $20.00/M |
| 2,217,311 Active Democrats | + $20.00/M |
| Catalog Rate | $80.00/M |
| Charitable Fundraising Rate | $75.00/M |
| Non-Profit Rate | $85.00/M |
| Political Rate | $90.00/M |

*Discounts available on Multi-Touch campaigns, please inquire!

| ID NUMBER | |
|---|---|
| NextMark | 253382 |
| Manager | 35330 |

**UNIVERSE**
8,804,819

**LIST TYPE**
Consumer        email   mail

**SOURCE**
Direct mail sold

**LIST MAINTENANCE**

| | |
|---|---|
| Counts through | 07/31/2018 |
| Last update | 08/31/2018 |
| Next update | 09/10/2018 |

**SELECTS**

| | |
|---|---|
| 1 MONTH HL | $17.00/M |
| 3 MONTH HL | $14.00/M |
| 6 MONTH HL | $12.00/M |
| AGE | $16.00/M |
| BLOW-INS | $10.00/M |
| BUSINESS ADDRESS | $11.00/M |
| CHANGE OF ADDRESS | $13.00/M |
| ETHNIC/RELIGIOUS | $16.00/M |
| GENDER | $9.00/M |
| GEO (SCF, ZIP, STATE) | $9.00/M |
| GIFT GIVERS | $14.00/M |
| HOME ADDRESS | $5.00/M |
| INCOME | $16.00/M |
| INTERESTS | $16.00/M |
| LIFESTYLE SELECT | $16.00/M |
| Magazine Titles | $10.00/M |
| NTF/RENEWALS | $13.00/M |
| PAID | $12.00/M |
| Political Party | $20.00/M |
| PRESENCE OF CHILDREN | $16.00/M |
| SOURCE | $12.00/M |
| SWEEPS YES | $12.00/M |

**GEOGRAPHY**
USA

**UNIT OF SALE INFORMATION**

| | |
|---|---|
| Average: | $18 |

**GENDER PROFILE**

| | |
|---|---|
| Male: | 20% |
| Female: | 70% |

**AVERAGE INCOME**

| | |
|---|---|
| Dollar: | $86,765 |

**DESCRIPTION**

Subscribers to the following titles comprise the Hearst Magazines Masterfile: Car and Driver, Cosmopolitan, Country Living, Elle, Elle Decor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, Popular Mechanics, Redbook, Road & Track, Town & Country, Veranda and Woman's Day.

**Demographics:**
Age: 46
Income: $86,765
90% Married
Female 70% / Male 20%
Hearst Magazine readers are passionately involved with 'their' magazines, acting on tips and advice as well as responding to advertisers. Reach large numbers of confident consumers who are ahead of the trends and quick to act on their impulses.

The Masterfile is enhanced with Insource demographic and ethnic segments, available selections include (please inquire for additional segments & counts):

| Interest (+ $16/M) | Qty | Interest (+ $16/M) | Qty |
|---|---|---|---|
| Bible Devotional | 1,025,834 | Outdoor Enthusiasts | 3,052,907 |
| Book Readers | 5,032,485 | Pets: all | 6,885,845 |
| Collectibles | 1,799,350 | Pets: Cats | 1,004,723 |
| Contributors/Donors | 2,275,190 | Pets: Dogs | 1,337,208 |
| Cooking | 2,384,314 | Physical Fitness/Exercise | 4,674,611 |
| Crafts | 2,484,808 | Sports: all | |
| Do It Yourselfers | 2,792,394 | Sports: Camping/Hiking | 632,000 |
| Gardening | 2,774,763 | Sports: Exercise/Fitness | 4,674,611 |
| Gourmet Food/Cooking | 1,291,527 | Sports: Golf | 1,051,040 |
| Health/Natural Foods | 1,256,035 | Sports: Hunting | 771,524 |
| Music | 4,168,692 | Travel | |

*See* Complaint Ex. B.

3.     Renters are able to access the Personal Reading Information of Hearst

2

subscribers based on, but not limited to, "age," "income," "ethnic/religious," and "political

party." *Id.*

    4.      Hearst also offers access to its "Hearst Masterfile – Young Families" list, which

"includes families with children age 0-18," at the same base rate of "$110/M."

## Hearst Masterfile - Young Families

Hearst Magazines is one of the world's largest publishers of monthly consumer magazines. Its category-leading titles have been enhanced to present a masterfile of young families.

| SEGMENTS | | PRICE | ID NUMBER | |
|---|---|---|---|---|
| 1,675,055 | TOTAL UNIVERSE / BASE RATE | $110.00/M | NextMark | 254009 |
| | *Young Families (POC 0-18) | + $16.00/M | Manager | |
| 556,333 | 6 Month Active Subs | + $12.00/M | **UNIVERSE** | |
| 356,956 | 3 Month Active Subs | + $14.00/M | 1,675,055 | |
| 128,149 | 1 Month Active Subs | + $17.00/M | **LIST TYPE** | |
| | Catalog Rate | $80.00/M | Consumer | ✉ mail |
| | Charitable Fundraising Rate | $75.00/M | | |
| | Non-Profit Rate | $85.00/M | | |

**DESCRIPTION**

The Hearst Young Families Masterfile includes families with children age 0-18. These young families are ideal for apparel, books, educational aids, financial/investing, fundraising, insurance, magazines, parenting aids, toys and more.

Subscribers to the following titles comprise the Hearst Magazines Young Families Masterfile: Car and Driver, Cosmopolitan, Country Living, Elle, Elle Decor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, Popular Mechanics, Redbook, Road & Track, Town & Country, Veranda and Woman's Day.

| | Age 0-3 | Age 4-6 | Age 7-9 | Age 10-12 | Age 13-18 |
|---|---|---|---|---|---|
| Boys | 22,000 | 54,000 | 37,000 | 65,000 | 265,000 |
| Girls | 24,000 | 72,000 | 36,000 | 59,000 | 215,000 |
| POC | 773,000 | 693,000 | 473,000 | 345,000 | 697,000 |

**ADDITIONAL NOTES**

**Reuses are allowed at original order's base rate.

| SOURCE | |
|---|---|
| Direct mail sold | |
| **LIST MAINTENANCE** | |
| Counts through | 07/01/2018 |
| Last update | 09/04/2018 |
| Next update | 09/10/2018 |
| **SELECTS** | |
| 1 MONTH HL | $17.00/M |
| 3 MONTH HL | $14.00/M |
| 6 MONTH HL | $12.00/M |
| AGE | $16.00/M |
| BLOW-INS | $10.00/M |
| BUSINESS ADDRESS | $11.00/M |
| CHANGE OF ADDRESS | $13.00/M |
| GENDER | $9.00/M |
| GEO (SCF, ZIP, STATE) | $9.00/M |
| HOME ADDRESS | $5.00/M |
| INCOME SELECT | $16.00/M |
| LIFESTYLE SELECT | $16.00/M |
| Magazine Titles | $10.00/M |
| PAID | $12.00/M |
| PRESENCE OF CHILDREN | $16.00/M |

*See* Complaint Ex. C.

    5.      Hearst also offers access to its "Hearst Masterfile – Ethnic & Religious" list at

the same base rate of "$110/M."

### Hearst Masterfile - Ethnic & Religious

One of the world's largest publishers of monthly consumer magazines, Hearst Magazines appeal to readers of all ethnic and religious backgrounds. Its category leading titles have been merged and overlayed with ethnic and religious data.

| SEGMENTS | | PRICE |
|---|---|---|
| 10,098,812 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| | *Ethnic/Religious | + $16.00/M |
| | Catalog Rate | $80.00/M |
| | Charitable Fundraising Rate | $75.00/M |
| | Non-Profit Rate | $85.00/M |

**DESCRIPTION**

Hearst Magazines is one of the few publishers that continues to thrive despite a downturn in the publishing market. Much of the company's success is due to the fact that its many titles appeal to all types of people—African American, Hispanic, Asian—of all types of faith—Catholic, Jewish, Protestant. The Hearst Magazines Ethnic & Religious Masterfile presents a dynamic audience of sophisticated men and women of various ethnicities and religious beliefs.

Subscribers to the following titles comprise the Hearst Magazines Masterfile:

Car and Driver, Cosmopolitan, Country Living, Elle, Elle Decor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, Popular Mechanics, Redbook, Road & Track, Town & Country, Veranda and Woman's Day.

Tap into ethnic and religious data to reach large numbers of your best customers.

Ethnic/Religious segments include (*inquire for additional selects):

| Ethnicity (+ $16/M) | Qty |
|---|---|
| African American | 889,708 |
| Asian - other | 57,371 |
| Chinese | 74,449 |
| French | 238,108 |
| Hispanic | 684,944 |
| Irish | 611,725 |
| Italian | 306,618 |
| Japanese | 24,485 |

| Religion (+ $16/M) | Qty |
|---|---|
| Catholic | 2,160,850 |
| Jewish | 156,780 |
| Protestant | 5,270,391 |

| ID NUMBER | |
|---|---|
| NextMark | 253854 |
| Manager | 35336 |

**UNIVERSE**

10,098,812

**LIST TYPE**

Consumer    mail

**SOURCE**

Direct mail sold

**LIST MAINTENANCE**

| Counts through | 07/31/2018 |
|---|---|
| Last update | 09/04/2018 |
| Next update | 09/10/2018 |

**SELECTS**

| | |
|---|---|
| 1 MONTH HL | $17.00/M |
| 3 MONTH HL | $14.00/M |
| 6 MONTH HL | $12.00/M |
| AGE | $16.00/M |
| BLOW-INS | $10.00/M |
| BUSINESS ADDRESS | $5.00/M |
| CHANGE OF ADDRESS | $13.00/M |
| ETHNICITY | $16.00/M |
| GENDER | $9.00/M |
| GEO (SCF, ZIP, STATE) | $9.00/M |
| HOME ADDRESS | $5.00/M |
| INCOME SELECT | $16.00/M |
| Magazine Titles | $10.00/M |
| PAID | $12.00/M |
| PRESENCE OF CHILDREN | $16.00/M |
| RELIGION | $16.00/M |
| RENEWALS | $13.00/M |
| SOURCE | $12.00/M |

**GEOGRAPHY**

USA

*See* Complaint Ex. D.  According to the list offering, for an additional $16/M, renters can select Hearst subscribers who are "African American," "Jewish," or "Hispanic," among other demographic categories.  *Id.*

      6.      Rhode Island's RIVRPA clearly prohibits what Hearst has done.  Subsection (a) of the RIVRPA provides:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals, with the titles or nature of video films, records, cassettes, or the like, which they purchased, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops or any retailer or distributor of those products, whether or not the identities and listings are kept in

4

> a remote computing service or electronic storage or the disclosure
> is made through or by a remote computing service.

R.I. Gen. Laws § 11-18-32(a).

7.      Accordingly, Plaintiff brings this Class Action Complaint against Hearst for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the RIVRPA, and for unjust enrichment.

## NATURE OF THE CASE

8.      To supplement its revenues, Hearst licenses, rents, exchanges, or otherwise discloses its customers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion, parental status, and political affiliation—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

9.      Indeed, Hearst receives licensing fees in exchange for its subscribers' information.

10.     By licensing, renting, exchanging, or otherwise disclosing – rather than selling – its customers' Personal Reading Information, Hearst is able to disclose the information multiple times to third parties.

11.     Hearst's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, almost any organization can rent a customer list from Hearst that contains a number of categories of detailed subscriber information.  For example, almost any organization could rent a list with the names and addresses of all *Woman's Day* customers who are Spanish speaking, female, over the age of 80,

5

with no children in the household, and with a net worth of greater than $500,000.  Hearst would

rent such a list for approximately $180 per thousand customers listed.

12.     While Hearst profits handsomely from the unauthorized license, rental,

exchange, and/or disclosure of its customers' Personal Reading Information and other personal

information, it does so at the expense of its customers' privacy and statutory rights because

Hearst does not obtain its customers' written consent prior to disclosing their Personal Reading

Information.

**PARTIES**

13.     Plaintiff Christina Lachapelle is a natural person and citizen of the State of Rhode

Island.  Plaintiff Lachapelle is a subscriber to *Woman's Day* magazine, which is published by

Hearst.  Plaintiff Lachapelle purchased her subscription to *Woman's Day* magazine directly from

Hearst.  Prior to and at the time she subscribed to *Woman's Day*, Hearst did not notify Plaintiff

Lachapelle that it discloses the Personal Reading Information of its customers, and Plaintiff

Lachapelle has never authorized Hearst to do so.  Furthermore, Plaintiff Lachapelle was never

provided any written notice that Hearst licenses, rents, exchanges, or otherwise discloses its

customers' Personal Reading Information, or any means of opting out.  Since subscribing to

*Woman's Day*, Hearst licensed and/or disclosed, without consent or prior notice, Plaintiff

Lachapelle's Personal Reading Information to data aggregators and data cooperatives, who then

supplement that information with data from their own files.  Moreover, during that same period,

Hearst rented or exchanged mailing lists containing Plaintiff Lachapelle's Personal Reading

Information to third parties seeking to contact Hearst subscribers, without first obtaining Plaintiff

Lachapelle's written consent or even giving her prior notice of the licenses, rentals, exchanges,

and/or other disclosures.  Because Hearst licensed, rented, exchanged, and/or otherwise disclosed

her Personal Reading Information, Plaintiff Lachapelle now receives junk mail from non-profit

companies and other organizations that do not offer products or services through the mail. These unwarranted mailings waste Plaintiff Lachapelle's time, money, and resources. These harassing junk mailings received by Plaintiff Lachapelle are attributable to Hearst's unauthorized license, rental, exchange, and/or disclosure of her Personal Reading Information. Because Plaintiff Lachapelle is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Hearst's disclosure of her Personal Reading Information deprived Plaintiff Lachapelle of the full set of benefits to which she was entitled as a part of her *Woman's Day* subscription, thereby causing economic harm. Accordingly, what Plaintiff Lachapelle received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *Woman's Day* subscription had she known that Hearst would disclose her Personal Reading Information.

14.    Defendant Hearst Communications, Inc. is a Delaware corporation with its principal place of business at 300 West 57th Street, New York, NY 10019. Hearst does business throughout Rhode Island, New York, and the entire United States.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16.    This Court has personal jurisdiction over Hearst because Hearst conducts substantial business within Rhode Island, such that Hearst has significant, continuous, and

pervasive contacts with the State of Rhode Island.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Hearst does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Rhode Island's Video, Audio, And Publication Rentals Privacy Act*

18.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

19.    Recognizing the need to further protect its citizens' privacy rights, Rhode Island's legislature enacted the RIVRPA to "prohibit[] the revealing of records relating to the rental of video or audio tapes or publications." Explanation By The Legislate Council, attached as **Exhibit A**.

20.    Subsection (a) of the RIVRPA states:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals, with the titles or nature of video films, records, cassettes, or the like, which they purchased, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops or any retailer or distributor of those products, whether or not the identities and listings are kept in a remote computing service or electronic storage or the disclosure is made through or by a remote computing service.

R.I. Gen. Laws § 11-18-32(a).

21.     Rhode Island's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

22.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

23.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

24.     Despite the fact that thousands of Rhode Island residents subscribe to Hearst's publications, Hearst disregarded its legal responsibility by systematically violating the RIVRPA.

***The Personal Information Market:  Consumers' Personal Information Has Real Value***

25.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . .

[and] individuals are concerned about being defined by the existing data on themselves."[1]

26.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

27.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

28.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

29.    The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex,

---

[1] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Aug. 30, 2018).

[2] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Aug. 30, 2018).

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Aug. 30, 2018) (emphasis added).

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Aug. 30, 2018).

weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

30.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

31.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

32.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

33.     Data aggregation is especially troublesome when consumer information is sold

---

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Aug. 30, 2018).

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Aug. 30, 2018).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Aug. 30, 2018).

[8] *Id.*

to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Hearst share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

34.     Information disclosures like Hearst's are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]she elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

35.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Hearst's are

---

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams  (last visited Aug. 30, 2018).

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Aug. 30, 2018).

[11] *Id.*

[12] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Aug. 30, 2018).

particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

36.     Hearst is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

37.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

38.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

39.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

40.     Thus, as consumer privacy concerns grow, consumers are increasingly

---

[13] *See id.*

[14] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Aug. 30, 2018).

[15] *Id.*

incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

41.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

42.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

43.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

---

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Aug. 30, 2018).

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Aug. 30, 2018).

[18] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

*Hearst Unlawfully Licenses, Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

44.    Hearst maintains a vast digital database comprised of its subscribers' Personal Reading Information across all publication titles.  Hearst discloses its subscribers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each Hearst customer, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

45.    Hearst then rents, exchanges and/or discloses its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

46.    Hearst also licenses and/or discloses its subscribers' Personal Reading Information to data cooperatives, who in turn, either give Hearst money or access to their own mailing list databases.

47.    As a result of Hearst's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Hearst that identify Hearst customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Hearst's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Hearst will rent—to almost any organization willing to pay for it—a list with the names and addresses of all *Woman's Day* customers who are Jewish, Republican, single, over the age of 80,

with a net worth of greater than $500,000, no children in the household, and a history of charitable donations.

48.     Hearst does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

49.     Consumers can sign up for Hearst subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Hearst never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Hearst uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

50.     As a result, Hearst disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[19] – to anybody willing to pay for it.

51.     By and through these actions, Hearst has intentionally disclosed to third parties its Rhode Island customers' Personal Reading Information without consent, in direct violation of the RIVRPA.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff seeks to represent a class defined as all Rhode Island residents who had their Personal Reading Information disclosed to third parties by Hearst without consent (the

---

[19] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Aug. 30, 2018).

"Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

53.    Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

54.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Hearst is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether Hearst obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Hearst's disclosure of Plaintiff's and the Class's Personal Reading Information violated Rhode Island General Laws § 11-18-32; and (d) whether Hearst's license, rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

55.    The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

56.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by

Plaintiff and her counsel.

57.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### COUNT I
### Violation of the Video, Audio and Publication Rentals Privacy Act
### (R.I. Gen. Laws § 11-18-32)

58.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

59.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Hearst.

60.     As a magazine publisher that sells subscriptions to consumers, Hearst is a retailer or distributor of publications.  *See* R.I. Gen. Laws § 11-18-32(a).

61.     By purchasing a subscription to *Woman's Day*, Plaintiff purchased a publication from Hearst.  *See* R.I. Gen. Laws § 11-18-32(a).

62.     *Woman's Day* magazine is a publication within the meaning of R.I. Gen.

Laws § 11-18-32.

63.     Indeed, Hearst refers to *Woman's Day* magazine as a "publication."

64.     At all times relevant, and beginning on the dates Plaintiff initiated her *Woman's Day* subscription, Hearst disclosed Plaintiff's Personal Reading Information, which identified her as a *Woman's Day* customer, in at least three ways.

65.     First, Hearst disclosed mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Hearst.

66.     Second, Hearst licensed and/or disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn either gave Hearst money or access to their own mailing list databases.

67.     Third, Hearst rented and/or exchanged its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

68.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Hearst was able to increase its profits gained from the mailing list rentals and/or exchanges.

69.     By renting, exchanging, or otherwise disclosing its customer lists, Hearst disclosed to persons other than Plaintiff records which would identify her name and address with the title of the publication she purchased. *See* R.I. Gen. Laws § 11-18-32(a).

70.     Plaintiff and the members of the Class never consented to Hearst disclosing their

Personal Reading Information to anyone.

71.     Worse yet, Plaintiff and the members of the Class did not receive notice before Hearst disclosed their Personal Reading Information to third parties.

72.     On information and belief, Hearst's disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to lawful compulsion.

73.     Hearst's disclosures were not made to other employees of Hearst incident to the normal course of their work.  Hearst's disclosures of Plaintiff's Personal Reading Information were made to third parties, including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Hearst's revenue.

74.     By disclosing Plaintiff's Personal Reading Information, Hearst violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* R.I. Gen. Laws § 11-18-32(a).

75.     Additionally, because Plaintiff and the members of the Class paid for their subscriptions to Hearst's publications, and Hearst was obligated to comply with the RIVRPA, Hearst's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Hearst's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

76.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that

keeps their Personal Reading Information private is more valuable than one that does not.

77.     Accordingly, had Plaintiff been adequately informed of Hearst's disclosure

practices, she would not have been willing to purchase her *Woman's Day* subscription at the

price charged, if at all.  Thus, Hearst's unlawful disclosures caused Plaintiff economic harm.

78.     Hearst's disclosure of Plaintiff's Personal Reading Information to third parties has

also caused an influx of third party print advertisements.

79.     As a result of Hearst's unlawful disclosure of their Personal Reading Information,

Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf

of herself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant Hearst to obtain

consent from Rhode Island customers prior to the disclosure of their Personal Reading

Information as required by the RIVRPA; (2) actual damages or $250.00, whichever is greater,

for each violation, per Class member pursuant to R.I. Gen. Laws § 11-18-32(d); and (3) costs and

reasonable attorneys' fees pursuant to R.I. Gen. Laws § 11-18-32(d).

## COUNT II
### Unjust Enrichment

80.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set

forth herein.

81.     Plaintiff brings this claim individually and on behalf of the members of the Class

against Defendant Hearst.

82.     Plaintiff and the Class members conferred benefits on Hearst by providing Hearst

with their Personal Reading Information and paying Hearst for their magazine publication

subscriptions.

83.     Hearst received and retained the information and money belonging to Plaintiff

and the Class when Plaintiff and the Class subscribed to Hearst's publications.

84.     Because Hearst received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Hearst has employees and/or agents handling customer accounts and billing as well as customer data, Hearst appreciates or has knowledge of such benefits.

85.     Under the RIVRPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

86.     Under principles of equity and good conscience, because Hearst failed to comply with the RIVRPA, Hearst should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

87.     Moreover, Hearst should not be allowed to retain the monies it received as a result of licensing, renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

88.     Plaintiff and the other Class members have suffered actual damages as a result of Hearst's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

89.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Hearst's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

90.     Further, a portion of the purchase price of each Hearst magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's

and the other Class members' Personal Reading Information, as required by the RIVRPA. Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

91.     To prevent inequity, Hearst should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Hearst's rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

92.     Accordingly, Plaintiff and the Class members seek an order declaring that Hearst's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Hearst through its rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

**PRAYER FOR RELIEF**

93.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.     For an order declaring that Defendant's conduct as described herein violates the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For an award of actual damages or $250, whichever is greater, for

each violation, to Plaintiff and each Class member, as provided by the Video, Audio, And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32(d);

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and;

H.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  September 25, 2018                    Respectfully submitted,

**LAW OFFICES OF PETER N. WASYLYK**

By:    _/s/ Peter N. Wasylyk_
         Peter N. Wasylyk

Peter N. Wasylyk (R.I. Bar # 3351)
1307 Chalkstone Avenue
Providence, RI 02908
Telephone:  (401) 831-7730
Facsimile:  (401) 861-6064
Email:  pnwlaw@aol.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor*
Joseph I. Marchese*
Philip L. Fraietta*
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
           jmarchese@bursor.com
           pfraietta@bursor.com
*Pro Hac Vice* Forthcoming

*Attorneys for Plaintiff*